IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| DENNIS POTTER,<br><br>  Plaintiff,<br><br>vs.<br><br>HARTFORD LIFE INSURANCE COMPANY, and MONUMENTAL LIFE INSURANCE COMPANY,<br><br>  Defendants. | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br><br><br>Case No. 1:05-cv-00157 |

When Dennis Potter's wife, Shirlee Potter, died at a nursing home, Mr. Potter tried to collect on a life insurance policy covering Mrs. Potter. The insurance company, Monumental Life Insurance Company, refused to pay on the policy, claiming Mrs. Potter's death resulted in part from sickness, not solely, directly, and independently from an injury, as the policy required. Claiming this refusal constitutes breach of contract, Mr. Potter has sued Monumental. Monumental has moved for summary judgment on Mr. Potter's claim. Because the court finds the policy unambiguously excluded any coverage for a death not solely, directly, and independently resulting from an injury and because the undisputed facts show Mrs. Potter's polyneuropathy significantly contributed to her death, the court must grant Monumental's motion. Due to the detailed briefs and the clarity of the record, oral arguments are unnecessary.

**BACKGROUND**

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  Viewed in this light, the record reflects the following facts.

In August 1997, Dr. Robert Nash, an internist at the Budge Clinic in Logan, Utah, began treating Mrs. Potter as a regular patient.  In November 2002, Mrs. Potter saw Dr. Nash, complaining of debilitating weakness.  Dr. Nash became concerned.  Although Mrs. Potter suffered from diabetes, Dr. Nash thought her weakness and pain was more severe than that generally associated with diabetic peripheral neuropathy.  Dr. Nash opined Mrs. Potter was probably suffering from chronic inflammatory demyelinating polyneuropathy ("CIPD") — a type of motor-inhibiting neuropathy.  Dr. Nash determined the CIPD was causing muscle weakness in Mrs. Potter's diaphragm, leading to breathing difficulty.

Mrs. Potter's condition progressively worsened.  Dr. Nash noted that Mrs. Potter's "clinical course had been one of progressive and relentless progression."[2]  And in the last several months of her life, Mrs. Potter was "responding less" to treatment[3] and "clearly declining."[4]  Dr. Nash concluded that "if she continued in the downward trend that she was, that she would have

---

[1] *See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

[2] Nash Depo. 73:10–19 (Docket No. 25, Exh. D).

[3] *Id.*

[4] *Id.* at 76:25.

eventually succumbed from [the CIPD]."[5]  In December 2003, for example, Mrs. Potter lost consciousness and was taken to the emergency room at Logan Hospital in Logan, Utah.  Dr. Nash describes this as "a first of what was a series of hospitalizations . . . where she became very much incapacitated by her disease."[6]  Mrs. Potter was again hospitalized on January 5, 2004.  Her relevant symptoms included rapid weight loss, daily shortness of breath, and an unusual fluid increase between her lungs and chest wall.  Then, on January 7, 2004, Mrs. Potter suffered from acute respiratory failure.  Because she was unable to breathe on her own, she was transported to LDS Hospital in Salt Lake City, Utah, via LifeFlight.  In the intensive care unit, Mrs. Potter was placed on a ventilator.  She remained at the hospital for more than two months, but was eventually released.

     Mrs. Potter's time outside the hospital did not last long.  She was again admitted to Logan Hospital on April 2, 2004, after being injured by a fall related to her condition.  After this, Mrs. Potter never regained sufficient health to return to home.  From Logan Hospital, Mrs. Potter was transferred to LDS Hospital.  While there, she was conclusively diagnosed with CIPD.  While the cause of the CIPD was unknown, some doctors linked it to Guillain-Barre syndrome.  Then, in May 2004, Dr. Nash arranged for Mrs. Potter to be transferred to the Sunshine Terrace nursing home in Logan, Utah.

     At Sunshine Terrace, Mrs. Potter was wheelchair- or bed-bound at all times.  At the time of her transfer, she suffered from respiratory failure and persistent respiratory weakness due to

---

[5] *Id.* at 73:10–19.

[6] *Id.* at 31:3–5.

her CIPD such that she used a portable ventilation device (a "BiPAP") to help her breathe at night.  Dr. Nash testified that the BiPAP was no guarantee Mrs. Potter would not go into respiratory failure.  The device would not breathe for her.  Mrs. Potter still had to initiate the breath — the BiPAP would just make breathing easier after Mrs. Potter initiated a breath.

In August 2004, Mrs. Potter was again admitted to the Logan Hospital with trouble breathing.  After this visit, Mrs. Potter began using the BiPAP consistently, not just at night.  The Sunshine Terrace knew of Mrs. Potter's needs regarding the BiPAP and Dr. Nash was unaware of the staff there ever neglecting to have Mrs. Potter use the BiPAP.

On September 11, 2004, Mrs. Potter was transported to Logan Hospital by ambulance.  Doctors discovered her feeding tube had become clogged, so they replaced it.  Mrs. Potter returned to the Sunshine Terrace at about 5:00 p.m. that same day.  Later, nurses found Mrs. Potter in her room, not breathing and without a pulse.

When Dr. Nash was informed of Mrs. Potter's death, he spoke with caregivers at Sunshine Terrace to obtain details.  Among other things, the nurses told Dr. Nash that Mrs. Potter had been returned to her BiPAP machine after she arrived at Sunshine Terrace.  Even though no one had witnessed Mrs. Potter's death, Dr. Nash believed he had sufficient information to ascertain the most likely cause of her death and to fill out her death certificate.  He felt confident doing so because of the information about Mrs. Potter's death he had obtained from her caregivers and because of his "intimate[]" familiarity with her medical history.[7]

Dr. Nash signed a death certificate for Mrs. Potter on September 15, 2004, indicating the

---

[7] *Id.* at 12:1–4.

direct cause of her death was respiratory failure.  Dr. Nash believed the respiratory failure stemmed from muscle weakness associated with her CIPD, so he Nash listed CIPD as the underlying cause of Mrs. Potter's death and classified her death as "natural."  Dr. Nash believed CIPD was "the most likely cause of her death" in light of the "scenario that was described by the nurses."[8]  In reaching this conclusion, Dr. Nash simply recorded the cause of Mrs. Potter's death, as he saw it, giving no consideration to the insurance policies of the Potters.  In his deposition testimony, Dr. Nash explained further, "I believe [Mrs. Potter's] ultimate cause of death was that she had the inability to breathe on her own without the use of the machine."[9]  He also concluded that "the underlying neurologic condition is what ultimately led to her demise."[10]

On November 11, 2004, Mr. Potter called Dr. Nash, requesting that he amend Mrs. Potter's death certificate.  Mr. Potter asked that Dr. Nash classify Mrs. Potter's death as accidental because Mrs. Potter "had an insurance policy that if she died from an accident would reimburse him."[11]  Mr. Potter claimed that on the day of Mrs. Potter's death, the nurses had not put Mrs. Potter back on her BiPAP for several hours after she returned from the hospital.

On December 13, 2004, Dr. Nash wrote to Mr. Potter in response to this conversation.  In his letter, Dr. Nash indicated he would not amend Mrs. Potter's death certificate and he expressed his opinion on the cause of Mrs. Potter's death, consistent with the original death

---

[8] *Id.* at 13:11–18.

[9] *Id.* at 81:10–12.

[10] *Id.* at 81:23–24.

[11] *Id.* at 54:7–16.

certificate. Dr. Nash testified that Mrs. Potter could have died from respiratory failure whether or not she was on the BiPAP machine. Further, he explained that the lack of the machine would not be the sole reason for her death, though it could be a contributing factor.

Despite all of this, Dr. Nash felt pressured by Mr. Potter's continued pleas to amend the death certificate, so Dr. Nash eventually signed a document that Mr. Potter had filled out. The document, an Affidavit to Amend Record, amended the death certificate to state that the immediate cause of Mrs. Potter's death was the absence of the BiPAP device, and Guillain-Barre syndrome was the underlying cause of death. Dr. Nash relied only on Mr. Potter's understandings and feelings in amending the death certificate.

Before all of this, in April 2004, Mr. Potter obtained a Group Mortgage Life Insurance Policy from Monumental Life. The policy provided that Monumental would pay the outstanding mortgage loan Mr. and Mrs. Potter owed Countrywide Funding in the event of either Mr. or Mrs. Potter's accidental death. Specifically, the policy would pay if either person's death resulted directly and independently from injury. The policy reads as follows:

### BENEFITS

> We will pay the Accidental Death Benefit shown in the Schedule when we receive proof that you died as a result of an Injury, provided death occurred within 365 days of the Injury. The benefit will be applied to reduce or pay off your Outstanding Balance at the time of your death.[12]
>
> . . . .
>
> ### DEFINITIONS
>
> **INJURY** means bodily injury caused by an accident, independently of all other

---

[12] Group Mortgage Accidental Death Ins. Certificate 3 (Docket No. 24, Exh. C).

causes.  The Injury must occur while insurance is in force under the Policy.  The Injury must be the sole and direct cause of death.  The Injury must not be caused, or contributed to, by Sickness.

**SICKNESS** means an illness or disease of the body or mind.[13]

The policy also delineated specific exclusions from coverage.  For instance, the policy excluded coverage for death resulting from sickness:

### EXCLUSIONS

We will not pay for death caused by or resulting from:
    a.    Sickness or its medical or surgical treatment, including diagnosis;[14]

Based on this language in the policy, Monumental denied Mr. Potter's request for coverage benefits after Mrs. Potter died — on the grounds that her death did not solely, directly, and independently result from an accident.  In response to this denial, Mr. Potter brought this suit, alleging Monumental breached the mortgage life insurance agreement.  Mr. Potter also sued Hartford Life Insurance Company, but the parties stipulated to the dismissal of Mr. Potter's claims against Hartford.  Monumental, the sole remaining defendant, has moved for summary judgment on the grounds that the Monumental policy specifically excluded benefits for death resulting — even in part — from sickness or disease, and CIPD was the underlying cause of Mrs. Potter's death.

### STANDARD OF REVIEW

The court should grant summary judgment "if the pleadings, depositions, answers to

---

[13] *Id.* at 2–3.

[14] *Id.* at 3.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[15]  In determining the appropriateness of summary judgment, the court must "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the non-moving party."[16]  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."[17]

## DISCUSSION

A review of the undisputed facts shows a grant of summary judgment to Monumental to be appropriate, as Mrs. Potter's policy specifically excluded benefits for death resulting — even in part — from sickness or disease, and CIPD was the underlying cause of Mrs. Potter's death.

The key provision of the policy is completely unambiguous.  "Ambiguity exists when a contract provision is 'reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of a term.'"[18]  The policy states that, to be covered, the injury must be caused by an accident, "independently of all other causes," and the injury "must be the sole and direct cause of death."[19]  Given their plain meaning in the context of this provision, the

---

[15] Fed. R. Civ. P. 56(c).

[16] *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1199 (10th Cir. 2004).

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[18] *Pirkheim v. First UNUM Life Ins.*, 229 F.3d 1008, 1010–11 (10th Cir. 2000) (quoting *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1290 (10th Cir. 2000)).

[19]  Group Mortgage Accidental Death Ins. Certificate 2–3 (Docket No. 24, Exh. C).

words "independently," and "sole and direct" are not ambiguous.  Instead, the policy imposes a number of obvious conditions.  First, the loss must result independently from all causes other than accidental injury.  Next, injury must be the sole and direct cause — sickness must not contribute to the death.  Mr. Potter points out the need for the court to interpret the policy in a way most favorable to the insured, but never argues the policy covers anything other than a death caused independently, directly, and solely by accidental injury.  And to do so would be a contrived effort.

Not only is the language of the policy plain and unambiguous on its face, both Tenth Circuit and the Utah Supreme Court have determined that such language in insurance policies precludes coverage when death results from preexisting medical conditions, even in part.[20] Basically, when such a clause is present in an insurance policy, it is the insured's burden to prove that the death "occurred independently of all other cause, including a preexisting bodily infirmity."[21]

For instance, in *Pirkheim v. First UNUM Life Insurance*,[22] the Tenth Circuit determined that a life insurance policy with a "direct and independent" exclusionary clause plainly precluded coverage where a congenital defect contributed to the death of the insured's son.[23]  The insured's

---

[20] *See Pirkheim*, 229 F.3d at 1010–11; *Winchester v. Prudential Life Ins. Co.*, 975 F.2d 1479, 187–88 (10th Cir. 1992); *Elton v. Bankers Life & Casualty Co.*, 516 P.2d 165, 176–77 (Utah 1973).

[21] *Winchester*, 975 F.2d at 1487–88.

[22] 229 F.3d 1008 (10th Cir. 2000)

[23] *Id.* at 1101.

son had been born with a heart defect.  The boy had surgery when he was eight months old to repair the defect and, at this time, doctors implanted a pacemaker.  The pacemaker functioned well for about four years, at which time it failed, causing the boy's death.  The insured's policy covered the boy for death resulting directly and independently from accidental injury.  The lower court granted summary judgment to the insurance company, finding that the boy's heart problems, which necessitated the pacemaker, contributed to his death.  In other words, his death did not independently result from failure of the pacemaker so he had no coverage under the policy.  The Tenth Circuit agreed with the lower court, finding the contract language to be unambiguous, and finding that even though the pacemaker failure was the direct cause of death, the boy's death did not occur independently of all other causes; that is, his heart disease.[24]

The decision of the Utah Supreme Court in *Elton v. Bankers Life and Casualty Ins. Co.*,[25] confirms the legitimacy of this approach in Utah.  In *Elton*, the insured had an accidental death policy limiting coverage solely to accidental bodily injury, directly and independently of all other causes.  The court equated the standard under such a policy with that of sole proximate cause, finding that where an existing disease combines with an accident to result in death, the accident cannot be considered the sole or independent cause.[26]

In this case, viewing the facts in the light most favorable to Mr. Potter, Mrs. Potter's death can only be seen as a combination of an existing condition with an accident.  The

---

[24] *Id.*

[25] 516 P.2d 165 (Utah 1973).

[26] *Id.* at 176–77.

undisputed evidence shows Mrs. Potter's health was steadily declining due to her CIPD. Mrs. Potter's CIPD was the reason she utilized the BiPAP machine in the first place. And according to Dr. Nash, Mrs. Potter's CIPD caused her to suffer from chronic respiratory failure. In his deposition, Dr. Nash explained in great detail how the CIPD would lead to increased levels of carbon dioxide in Mrs. Potter's blood. Without these increased levels of carbon dioxide — caused by the CIPD — Mrs. Potter would not have died. In other words, but for her CIPD, Mrs. Potter would not have died or suffered injury from the absence of the BiPAP. For this reason, it is immaterial whether or not nursing staff returned Mrs. Potter to the BiPAP device after her return from the hospital. The BiPAP device only helped Mrs. Potter breathe — it would not breathe for her. Therefore, even though the absence of the BiPAP contributed to Mrs. Potter's death, her death resulted, at least in part, from preexisting disease.

As the *Pirkheim* court made clear, even if the death is caused by a malfunction or accident involving the medical device that should treat the underlying condition, the underlying condition is still a contributing cause of the death. In this case, even assuming Mrs. Potter was not placed back on her BiPAP after returning from the hospital, at most, this would constitute an accident involving the medical device that should treat her CIPD. But this does not change the fact that the CIPD significantly contributed to Mrs. Potter's death. As Dr. Nash explained, the absence of the BiPAP contributed to Mrs. Potter's death, but it was not the sole cause — her underlying neurological condition was "what ultimately led to her demise."[27] In light of Dr. Nash's unrefuted testimony that CIPD was the underlying cause of Mrs. Potter's death, no

---

[27] Nash Depo. 81:23–24 (Docket No. 25, Exh. D).

reasonable juror could find the absence of the BiPAP to be the sole and independent cause.

Mr. Potter has not refuted any of this evidence — he simply has not met his burden to prove Mrs. Potter's death occurred solely and independently from injury.[28]  Mr. Potter unsuccessfully attempts to distinguish *Pirkheim*, instead, claiming an opinion from the Missouri Court of Appeals is most similar to the case at hand.  But the facts of *Mayfield v. Metropolitan Life Insurance Company*,[29] are less relevant than those of *Pirkheim*, the legal question is different and, of course, *Mayfield* holds no precedential value.  In *Mayfield*, the insured died when his endotracheal tube dislodged during surgery.  The court found this to be the direct cause of the insured's death, but this finding is inapposite in light of the different legal question at issue.  The issue in *Mayfield* was whether a provision excluding deaths resulting from medical or surgical treatment barred coverage.[30]  In other words, unlike in the case at hand, the contribution of an underlying health condition to the insured's death was not at issue.  In *Mayfield*, the defendants did not even argue the underlying diverticulitis contributed to the death.  Thus, the case fails to help Mr. Potter's argument.

Mr. Potter also contends that while CIPD may have made Mrs. Potter more susceptible to death by respiratory failure, it was not a contributing cause.  But this argument stands contrary to the words of Dr. Nash, and Mr. Potter has presented no evidence refuting Dr. Nash's declaration about the cause of Mrs. Potter's death and the progression of her disease.  Additionally, Mr.

---

[28] *Winchester*, 975 F.2d at 1487–88.

[29] 585 S.W.2d 163 (Mo. Ct. App. 1979).

[30] *Id.* at 168–69.

Potter relies heavily on Mrs. Potter's amended death certificate to support his argument that Mrs. Potter's respiratory failure was caused by the absence of the BiPAP machine. But even accepting this a true, the policy requires more than this direct causation component. To be covered, the absence of the BiPAP machine would need to be the sole and independent cause as well as the direct cause. Even the amended death certificate lists Guillain-Barre syndrome as the underlying cause of Mrs. Potter's death. The fact that Dr. Nash changed the cause of death from "natural" to "accidental" does not establish the death was accidental for purposes of the policy, especially in light of Dr. Nash's testimony as to why he made the change, and his testimony regarding Mrs. Potter's CIPD. As discussed before, the testimony from Dr. Nash establishes CIPD significantly contributed to Mrs. Potter's death.

Finally, Mr. Potter argues that reading the policy to include situations like Mrs. Potter's death is necessary to honor the reasonable expectations of purchasers of such policies. But the reasonable expectations doctrine only applies where a contract is ambiguous.[31] Here, the language of the policy conspicuously and unambiguously excludes coverage for deaths resulting — even in part — from anything other than accidental injury. For this reason, Mr. Potter's reasonable expectations argument fails.

In sum, the court must grant Monumental's motion for summary judgment. The undisputed facts show CIPD to be the underlying cause of Mrs. Potter's death, and Mr. Potter provides no evidence to refute this. Because the Potters' policy limited payment of benefits to deaths resulting solely, independently, and directly from injury, Mrs. Potter's death is not

---

[31] *Pirkheim*, 229 F.3d at 1011.

covered, as a matter of law. In other words, as an express policy condition was not satisfied, Monumental did not breach the policy by denying benefits to Mr. Potter.

## CONCLUSION

Consequently, the court GRANTS Monumental's motion for summary judgment [#24]. The Clerk of the Court is directed to enter judgment accordingly and to close the case.

DATED this 17th day of July, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge